IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**REBECCA LYNN "BECKY" LUCAS**,

       Plaintiff,

    v.                                    Case No.

**THE CITY OF REYNOLDSBURG,**

    and

**OFFICER N. RUBENSTAHL**,                         **COMPLAINT AND
JURY DEMAND**

    and

**OFFICER R. MARTIN**,

       Defendants.

## JURISDICTION

1.    This is a civil rights action for police misconduct.  This case involves an incident in which the Defendant officers came to Ms. Lucas's home one night for the purpose of arresting her on a warrant for a misdemeanor offense.  When Ms. Lucas awoke and came to her front door, the Defendants grabbed her without warning or an opportunity to comply voluntarily.  They forcefully pulled her from the doorway and slammed her down onto the concrete porch, causing her serious injuries.  In addition, the Defendants falsely charged Ms. Lucas with resisting arrest, and filed false police reports to justify their uses of force.  Plaintiff alleges that the Defendants violated her rights guaranteed by the Fourth Amendment to the United States Constitution and 42 U.S.C. §1983. The Court has jurisdiction pursuant to 28 U.S.C.§§1331 and 1343.

## **PARTIES**

2.  Plaintiff Rebecca Lynn "Becky" Lucas is a 45 year old citizen of the United States, and a resident of Reynoldsburg, Ohio.

3.  Defendant City of Reynoldsburg is a political subdivision of the State of Ohio.  It is a duly authorized and established municipality located in Franklin County.  It is and was at all times relevant the employer, master and principal of Defendants Rubenstahl and Martin.

4.  Defendants Officer Rubenstahl and Officer Martin are and were at all times relevant police officers for the City of Reynoldsburg, and employees, agents and servants of the City.  They were at all times relevant acting within the scope of their employment and under color of state law.  All acts alleged against these Defendants were done knowingly, intentionally, maliciously, recklessly, in bad faith and with callous indifference to the Plaintiff's constitutional rights. They are sued in their individual capacities.

## **FACTS**

### **A.  Plaintiff Becky Lucas**

5.  Becky Lucas was born and raised in Reynoldsburg and has lived there her entire life.  She graduated from Reynoldsburg High School in 1995.  Becky then attended Otterbein College for two years.  She studied sports medicine and played on the Otterbein soccer team.  She transferred to Columbus State and attended for one year.

6.      In 1998, Ms. Lucas's daughter Taylor was born.  Becky raised her daughter as a single mother.  Taylor grew up in Reynoldsburg and attended school there.  Taylor is now 24 years old, married, and has two children ages 5 and 1.  Becky regularly spends time with her daughter and grandchildren.

7.      After Taylor was born, Becky had to work full time.  She worked as a server and then, for about 10 years, as a custodian for the Hilliard City Schools.  During these years Becky was able to purchase a home for herself and her daughter.  She found one only a few blocks from her parents' home and bought it in 2003.  The house is located at 7292 Sabre Avenue, Reynoldsburg, Ohio.  Becky still lives there, and it is the address where the incident in this case occurred.

8.      At the end of 2010 both of Ms. Lucas's parents were diagnosed with cancer.  She left her job and went to help them for an extended period of time during which she was unemployed.  Both her mom and dad recovered and were eventually cancer free, so Becky was able to return to work.  She worked for several years as a packer in warehouses for companies such as Abercrombie & Fitch.  Beginning in early 2019, Ms. Lucas was employed through Goodwill Industries, which has contracts with many large clients to provide building/office cleaning services.  Becky worked first at OSU Hospital, and then at the Ohio Department of Agriculture as a supervisor of cleaning operations.  She had been at that job 9 months, making $15.00 per hour base pay plus overtime, until the night of the incident herein, February 20, 2022.  She has not been able to work since then.

9.      For many years, Ms. Lucas has been diagnosed with, and treated for, degenerative disc disease and spondylosis.  Although this causes her chronic back

pain, her physicians have been able to treat her and manage the pain, and she was always able to work full time in spite of these medical conditions, prior to February 20, 2022.

### B.  Circumstances Leading to the Presence of Reynoldsburg Police at Ms. Lucas's Home On February 20, 2022

10.     During the almost twenty years she has lived at 7292 Sabre Avenue, Ms. Lucas has had several different neighbors living in the house immediately to the west of her home.  That address is 7284 Sabre. Ms. Lucas has always had cordial relations with all of those residents at 7284.  She never had any complaint about them, and none of them ever expressed any complaints about her.

11.     Recently, a new couple moved into 7284 Sabre.  Beginning in about December of 2021, this couple approached Ms. Lucas about their interest in buying her home. Becky told them she was not interested in moving, but the new neighbors persisted, pressuring her to sell them her home.  When it was clear that she was not going to change her mind, these neighbors became angry.  They purchased and installed a series of six expensive "pan/tilt/zoom" surveillance cameras along the roofline of their home.  These cameras are all on the side of their house facing Ms. Lucas's home.  They are positioned in such a way as to allow the neighbors to see over the six-foot-high privacy fence between the properties, and into Becky's front and back yards, her porch, patios, driveway and bedroom.

12.     Since the new neighbors began surveilling Ms. Lucas and her home, they have filed a series of complaints about Ms. Lucas with various departments of the Defendant City of Reynoldsburg, including a Building Division, Parking Enforcement,

and the Police Department.  The details of these various complaints, and the ongoing rancor with the neighbors, is irrelevant to the issues in this civil rights litigation, with one narrow exception.  The Supreme Court has held in Graham v.Connor, 490 U.S. 386 (1989), that in determining whether a particular use of force used in a given instance is reasonable or unreasonable under the Fourth Amendment, one of the factors that should be considered is "the severity of the crime at issue".  For this reason, Plaintiff must describe the allegations that were at issue when Reynoldsburg Police officers came to Ms. Lucas's home on the evening in question.

13.    On February 3, 2022, the Plaintiff's neighbors had gone to the Reynoldsburg Mayor's Court and filed a criminal complaint alleging that Rebecca Lucas, on that date, "did knowingly move, deface, damage, destroy or otherwise tamper with the property of another, to wit: Rebecca Lucas knowingly moved/tampered with a 'no trespassing' sign on the property of Jennifer Bianchi, per Jennifer Bianchi this occurred at 7284 Sabre Avenue, in violation of section 541.04AC City Code, a Misdemeanor of the 3rd degree."  The alleged crime is entitled "criminal mischief".  A copy of this complaint is attached as Exhibit 1.  Also attached as Exhibit 2 is a photograph showing a row of small signs on wire stands which the neighbors had placed along their driveway.

14.    Ms. Lucas was unaware that this charge had been filed, or that a warrant for her arrest had been issued, when Reynoldsburg police officers came to her house on the evening of February 20, 2022.

## C. The Violent Arrest of Becky Lucas

15.     This arrest occurred on a Sunday night.  Ms. Lucas had turned in early that evening.  She had to get up around 4:00 a.m. in order to complete her morning routine and then make it to her 6:00 a.m. shift at the Department of Agriculture offices in Licking County.  As the supervisor, it was important for her to be there before the shift started.  She had fallen asleep before the police arrived.

16.     A sizeable group of Reynoldsburg police officers came to Ms. Lucas's home.  It was fully dark outside.  Two officers, Defendants Rubenstahl and Martin, were assigned to approach the house and make contact with Becky.  Three other cruisers, containing Officers Schambo, Patterson and Wright, stood by down the street and hurried to the scene when the first two officers were on Becky's porch.  Only Rubenstahl and Martin participated in the arrest.  The other three came up to the house on foot and stood backup.

17.     Becky Lucas was awakened from a sound sleep at exactly 7:35 p.m., by the sounds of men pounding on her door and shouting, as well as the barking of her dogs.  She got up, gathered herself, and started for her front door.  She heard the voices outside yell "Reynoldsburg Police Department, Rebecca we need you to come to the front door and talk to us", followed by "Rebecca, you need to come talk to us.  We will get a warrant, come back and kick down the door."

18.     In spite of the fact that the officer who was yelling sounded highly agitated, Ms. Lucas did exactly as she was told.  She complied with the officers' instruction that she come to the front door, open it, and speak with them.  At 7:36 p.m., the Plaintiff opened her front door and left it wide open.  She appeared in the doorway, pushed

open the storm door with her right hand and forearm, faced the officer who was closest to the door, Defendant Rubenstahl, and said a single word, "what?"  This was the only word Ms. Lucas spoke before the violence started, just two seconds later.

19.    As soon as the Plaintiff appeared in the doorway Defendant Rubenstahl said "hi, Rebecca?"  As he said that he stepped forward, inside the opened storm door and in close proximity to Becky.  She was leaning slightly forward, outward, expecting the policeman to explain to her why they were there.  Officer Rubenstahl began to speak, but as he did, he reached his right hand across in front of him, grabbed the Plaintiff's right forearm tightly, and jerked her outward toward the porch.  He said, "come out here with me, okay?", but he was already clutching her arm tightly and pulling hard on it while he said those words.  As a result, Ms. Lucas had no opportunity to comply with this instruction voluntarily before the use of force began.

20.    This sudden violence by Defendant Rubenstahl was startling, frightening and painful to Ms. Lucas.  His pulling her right arm outward spun her body to the left and she lost her balance.  As her right side was pulled onto the porch, she grabbed the doorframe with her left hand and held on briefly, to protect herself from falling.  At the same time Defendant Rubenstahl shouted, in a much more aggressive voice than before, "you are under arrest."

21.    Defendant Martin came onto the porch and grabbed Ms. Lucas's right forearm.  At the same time Defendant Rubenstahl moved to his left, directly behind Becky, grabbed her sweatshirt tightly with his left hand, held her upper right arm with his right hand, and both officers pulled her forcefully onto the porch.  Ms. Lucas had let go

of the doorframe and was now fully outside of the house, in an upright position. She was completely under the control of the two officers.

22.     These events happened very rapidly. From the time that Becky opened the storm door and appeared in the doorway to the time that she was on the porch, upright, being held by both officers, only six seconds had passed. During that time, she had not said or done anything of a threatening nature. She had been neither verbally nor physically aggressive. She was not struggling or fighting with the officers. There had been no need to use force to bring her out of the house. And now that she was out on the porch, in custody, under their complete control, physically passive, there was no need to use any further violence during the handcuffing process.

23.     Nevertheless, Defendants Rubenstahl and Martin proceeded to throw Becky Lucas down onto the concrete-slab-porch, causing her to land on her right side with great force. This was accomplished by Officer Martin kicking Becky's right leg out from under her, as both officers shoved her body downward until it slammed into the hard surface. During this takedown Defendant Martin yelled "get on the fuckin' ground." Martin described this takedown maneuver in his police report this way: "Officer Rubenstahl and I physically took her to the ground attempting to use a bent arm bar technique on her right arm." Defendant Rubenstahl confirmed in his report that this use of force was engaged in by both Defendants: "Officer Martin and I physically placed Ms. Lucas onto the ground."

24.     When Defendants Rubenstahl and Martin engaged in the act of body-slamming Ms. Lucas as soon as she was on the porch, they denied her the opportunity to submit to the handcuffing process voluntarily and peacefully. They could have simply

handcuffed her standing on the porch.  Neither officer said "we're going to handcuff you now."  Neither officer instructed her to put her hands behind her back so they could be cuffed.  She was a fully compliant arrestee, under their complete physical control, securely in custody, and neither actively nor passively resisting.  Under these circumstances the use of additional violence against her by throwing her to the ground was simply gratuitous.  As the Sixth Circuit explained in Smith v.City of Troy, 874 F.3d 938, 945 (6th Cir. 2017) (*per curiam*) "It was well-established at the time of the incident in this case that a non-violent, non-resisting, or only passively resisting suspect who is not under arrest has a right to be free from an officer's use of force."

25.     When she landed on the porch, she was on her right side, and her right hip and right shoulder areas hit first.  Defendant Martin was holding her right arm behind her and she was therefore unable to use it to soften the blow.  Both officers came down on top of her and rolled her onto her stomach.  One put his knee in her lower back and used his body weight to press down on her.  The Plaintiff believes, based upon the location of the knee, that this was Defendant Rubenstahl. This use of force was excruciatingly painful, as the pressure was on the area of Becky's back where she has degenerative disk disease and spondylosis.  Again, the takedown maneuver and the knee in her back all happened very rapidly.  The Plaintiff landed on the porch only 10 seconds after she had appeared in the doorway of her house, and only 4 seconds after she had come out onto the porch.

26.     The defendant officers proceeded to handcuff Ms. Lucas as they held her down.  Before the cuffs came out, Defendant Martin said to Rubenstahl "I got her hand." Rubenstahl responded, "got cuffs?"  Throughout the entire time that Becky lay face

down on the porch her hands were free and out to the sides. Defendant Martin was holding her right wrist. She never did or said anything suggesting an intention to resist being handcuffed, and her hands were in a position where they were available to the officers. In spite of this, Defendant Rubenstahl yelled out "give us your hands." Ms. Lucas responded, "you have them." Defendant Martin produced a pair of metal cuffs which were then affixed to each wrist with no problem whatsoever. Neither officer reported any physical or verbal resistance of any kind during the time when the Plaintiff was taken to the ground, held there, and handcuffed. Thus, the forceful knee pressed into her back while she lay on the ground was also unnecessary and gratuitous force.

27.     As she lay on the porch Ms. Lucas knew right away that she had been injured. She was experiencing severe pain throughout much of her body including her right hip, her back, and her right shoulder. She told the Defendant officers this. They ordered her to get up and sit in a lawn chair that was on her porch. She said she could not get up. After repeated requests to do so, Defendants Rubenstahl and Martin grabbed her and lifted her into the chair. She sat there in pain, cuffed behind her back, until medics responded. She was put on a stretcher and wheeled to the squad. The officers kept her cuffed until long after she was inside the emergency room at the Ohio Health Reynoldsburg Medical Facility.

### D. False Reports and Fabricated Excuses

28.     Immediately after leaving Ms. Lucas at the hospital emergency room, Defendants Rubenstahl and Martin prepared their official police reports regarding their arrest of Becky Lucas. The reports were written when the events were still fresh in their minds. Officer Martin's report was entered by him at 10:04 p.m. that evening. It

indicates that it was "modified" by Sergeant Ronald Wright at 4:24 p.m. the following afternoon, and then approved by the sergeant.  A copy of Defendant Martin's report is attached as Exhibit 3.  Officer Rubenstahl's report was entered by him at 10:38 p.m. on that evening.  It indicates that Rubenstahl "modified" his own report one minute later, at 10:39, and it was approved the next day by Sergeant Ronald Wright as well.  Sergeant Wright had been present at the Plaintiff's house during and after her arrest.  Defendant Rubenstahl's report is attached as Exhibit 4.

### 1.  The False Story of an Attempted Escape from Arrest

29.     Officer Rubenstahl filed a report that contained false information designed to create justifications for the uses of force upon Ms. Lucas.  Most notably, Rubenstahl wrote the following:

> At that time Ms. Lucas opened the door . . . I advised Ms. Lucas she was under arrest.  She attempted to retreat into the residence and shut the door.  I grabbed Ms. Lucas's right arm and began pulling her out of the residence.

This reporting gives a dishonest chronology, which suggests that (1) the officer advised Ms. Lucas she was under arrest first, as she was standing in the doorway; then (2) in response to being told she was under arrest, Ms. Lucas tried to evade arrest by flight, escaping inside the house and shutting the door; and finally (3) in response to Ms. Lucas's trying to escape, Defendant Rubenstahl was required to use physical force to stop her flight and make the arrest.  This story, if true, would have legally justified the use of at least some force in order to prevent the escape of the arrestee. But this story was just a lie.

30.     Careful repeated viewings of Defendant Rubenstahl's body-worn camera recording, including frame-by-frame review, demonstrates the following chronology is

what actually occurred. When recordings are available, they trump a party's conflicting version of events. <u>Ashford v. Raby</u>, 951 F.3d 798, 800 (6th Cir. 2020) (citing <u>Scott v. Harris</u>, 550 U.S. 372, 378-80 (2007). At 19:36:40 Ms. Lucas has opened her solid front door, left it standing wide open behind her and she appears in the doorway. She is holding the storm door open with her right arm. Rubenstahl immediately steps toward her at the same time that he says "hi, Rebecca?" At 19:36:41 to 19:36:42 Defendant Rubenstahl reaches his left hand out and swings the storm door open further and away from Becky's right arm, grabs her right arm with his right hand, and pulls it. She stumbles slightly as she is pulled forward and turned to her left, and her right side is now out of the house with her right foot on the porch. While he is grabbing her and pulling her out, Rubenstahl says "come out here with me, okay?"

31.     At 19:36:42 – 19:36:43, Rubenstahl, while pulling Becky's right arm, steps behind her, and grabs her nightshirt under her left arm. Becky's right arm is raised and extended outward, going off-screen to the right. At 19:36:43 – 19:36:44, Ms. Lucas is facing the side of her doorway, half in and half out of the house. Rubenstahl's left hand is visible pulling her outward by her nightshirt, and Becky's right arm is still extended up and out as it is pulled by Rubenstahl's right hand, which is off-screen. It is at this moment when Officer Rubenstahl says "you are under arrest," and Ms. Lucas asks "why?"

32.     At 19:36:45 – 19:36:46 Becky is now completely outside the house. The doorway is visible just beyond her body. Rubenstahl's body-worn-camera is dark momentarily, then pointed down showing her lower back, then dark again, as he is holding her tightly from behind. She is still upright. Although Rubenstahl's camera does

not show it, Defendant Martin is now holding Becky's right arm. At 19:36:47 Martin yells "get on the fuckin ground" in an angry, aggressive tone. Although the action is fast and blurry due to the bodies all being pressed closely together, it is clear that by about 19:36:50 Becky has been taken down to the porch surface.

33.     Thus, contrary to the police report of Defendant Rubenstahl, when Ms. Lucas appeared in the doorway and opened the storm door, the first thing that happened was that the officer stepped forward, grabbed her right arm and started yanking on her. She had not been told she was under arrest before the use of force began, and her body was being forcefully yanked out of her house. She never took any steps back into the house, and she had not "attempted to retreat into the residence and shut the door." She stood still until she was grabbed and moved by Rubenstahl. She was only told she was being arrested after the violence began, and her body was being forcefully yanked out of her house. The Defendants' reported justification for the initiation of physical force on Ms. Lucas was a fabrication.

34.     Defendant Martin's body-worn camera does not provide footage of the first four seconds of contact between Ms. Lucas and Rubenstahl. Martin was off the porch, at the front corner of the house when Rebecca appeared in the doorway. Ms. Lucas had put up a tarp around her front porch, in order to prevent the prying neighbors from surveilling her as she sat on her porch. For this reason, Defendant Martin could not see onto the porch from his initial position. But when he heard Rubenstahl speak to Becky, Martin hurried onto the porch. He came through the tarp and could see the events beginning at 19:36:44. His camera did record Rubenstahl telling the Plaintiff "you are under arrest" just as he came through the tarp, and it does show that Rubenstahl was

already pulling on Becky with both hands when he said that.  This again contradicts the story Defendant Rubenstahl told about the chronology of events.

35.     Moreover, there are a couple of later events captured by the officers' videos that bear on the officers' uses of force upon Ms. Lucas, and their likely awareness that their violent behavior toward Becky was unnecessary and excessive. Only minutes after the arrest, the Defendant officers were out in the Plaintiff's front yard when another officer, apparently a supervisor, pulled up and approached them to get their explanation for their use of force.  As Defendant Rubenstahl walked up he shut off his camera.  His hand can be seen turning it off.  Martin spoke first, saying "she's sittin in a chair up here claiming back issues, but . . . go ahead Rubenstahl." (Martin b.w.c., 19:43:39-43)  Rubenstahl began to describe the arrest, but Martin interrupted, saying "oh, hold on". Then Martin turned his camera off too (Martin b.w.c. 19:43:46).  He turned it back on at 19:44:35, after the conversation was over.  Fifty (50) seconds of their conversation is missing.  Thus, it occurred to both officers that they did not want their discussion of the force used on Ms. Lucas to be recorded.

36.     A minute later, an officer who had been speaking to Ms. Lucas about her injuries approached Defendants Rubenstahl and Martin and asked, in a challenging manner, "what happened?"  Rubenstahl began to speak, "I told her . . .", but then stopped and turned off his camera before continuing.  At the same time Defendant Martin said "I'll walk over here," and went far enough away that Rubenstahl's answer was not audible.  Once again, both Defendant officers were making sure their discussions about their use of force were not recorded.  (Martin b.w.c. 19:45:57)  These deletions were not revealed in either officer's police report.

14

37.     By way of contrast, as Becky Lucas sat in the chair on her porch, crying in pain, she was asked by a medic what had happened.  She immediately and accurately responded in an excited and extremely upset voice,  "They pulled me out of the house, slammed me on the ground, tell me there's a warrant for my arrest, they won't tell me nothing." (Martin b.w.c. 19:50:10-13)

## 2.  Irrelevant Talk of Guns and Dogs

38.     In Defendant Martin's police report, he made repeated references to "firearms" and "aggressive dogs," and he used these as purported justifications for the violent treatment of Ms. Lucas.  Martin's only source of information on these topics was the very same neighbor who had a negative bias against Ms. Lucas and who had filed the charge and the warrant they were there to serve.  Defendant Martin knew this neighbor disliked the Plaintiff, but he reported the neighbors' claims as truthful anyway: "John also informed me that Rebecca was [sp.] access to multiple firearms. . . . John also explained that Rebecca has multiple aggressive dogs.  . . . I believed that Rebecca could be armed and dangerous.  I advised officers that Rebecca was known to possess firearms and had aggressive animals."

39.     Officer Martin's report subsequently indicates that he relied on these factors in his decision to engage in the force he used against Becky Lucas.  He reported that "with Rebecca possibly being armed and dangerous, I immediately assisted Officer Rubenstahl with attempting to detain Rebecca.  I ordered Rebecca to the ground as I secured her right arm.  Officer Rubenstahl and I physically took her to the ground attempting to use a bent arm bar technique on her right arm."

40.     Defendant Rubenstahl also relied on the reported possibility of firearms and aggressive dogs in the house, in explaining his use of force against Becky Lucas. Rubenstahl reported: "Officer Martin aired over the radio that Ms. Lucas is known to have several firearms inside the residence and aggressive dogs. . . . I observed a sign right by the door stating that the resident is armed and has a picture of a firearm. . . . I grabbed Ms. Lucas's right arm and began pulling her out of the residence.  I did not want Ms. Lucas to gain entry into the residence due to the firearms inside and aggressive dogs."

41.     The police reports failed, however, to mention the facts which are relevant and decisive here.  When Becky Lucas came to the door and stood immediately in front of Defendant Rubenstahl she had no weapons.  Her hands were empty.  His violent seizure of her began only two seconds later.  She had made no threats of violence. She had not reached into her clothing as if to retrieve a weapon.  She had not moved toward the officer in an aggressive fashion.  In addition, she had no prior history of gun violence, and the arrest warrant which the police were there to serve did not involve firearms or violence.

42.     Many people lawfully possess firearms in their own homes.  Of course, police officers always need to be generally aware of the possibility of guns being used against them, and they have every right to respond with force when that occurs, in self-defense and defense of others.  But this possibility exists in essentially every police-citizen encounter.  The mere possibility that a homeowner owns a firearm does not support the conclusion that the individual "posed an immediate threat to the officer or others" justifying a use of force.   The Sixth Circuit has repeatedly rejected this

approach.  In <u>Shumate v. City of Adrian, Michigan</u>, 44 F.4th 427 (6th Cir. 2022), a case

where the plaintiff was also grabbed and thrown to the ground, the officers asserted a

"fear he intended to retrieve a weapon" as evidence of an objective threat.  The Court

held:

> This argument flies in the face of our caselaw and that of other
> circuits.  A reasonable officer would not believe that [the plaintiff] posed an
> immediate threat of harm when there was nothing - - no evasive
> movements towards a waistband, no threats of violence, no charging
> towards the officer - - suggesting possession or intent to possess a
> weapon.  <u>Browning v. Edmonson Cty.</u>, 18 F.4th 516, 526 (6th Cir. 2021) . . .
> We do not credit an officer's subjective fear that an individual had a
> weapon where objective indicia are absent.  <u>Browning</u>, 18 F.4th at 528
> ("[t]he remote risk that the suspect could have been armed does not
> establish that he posed a reasonable threat of danger.")

In <u>Barton v. Martin</u>, 949 F.3d 938 (6th Cir. 2020), a neighbor falsely reported to

police that the plaintiff had committed a crime, "shooting cats."  The officer snatched Mr.

Barton and slammed him against a hard surface, asserting fear of possible firearms.

The Court noted that when the officers saw Mr. Barton, he did not have anything in his

hands, and specifically found that "slamming Barton against the cabinet was no longer

reasonable once [the officer] realized that Barton was not holding anything in his

hands."  In this case, the Defendants' alleged fear that there might be weapons inside

Ms. Lucas's house did not create any legal justification for hurting her as they did.

43.     As for their references to possible "aggressive dogs" in the police reports,

this would have no logical relevance at all to their snatching and slamming Ms. Lucas.

The officers never even saw Becky's dogs that evening.

### 3.  Grabbing the Door Frame

44.     In his police report Defendant Rubenstahl states that "I grabbed Ms.

Lucas's right arm and began pulling her out of the residence. . . . Ms. Lucas grabbed the

door frame. . .".  This statement is true and accurate.  As she was being pulled quickly and powerfully out of her house, Becky lost balance and grabbed the door frame with her left hand in order to protect herself from injury.  She held it for less than two seconds and then let go.  Defendant Rubenstahl said the Plaintiff did this "in an attempt to prevent us from placing her under arrest".  This is false and self-serving reporting, but even if it were true, it would not provide a justification for either the first, second or third uses of force by the Defendants.

45.     The Defendants cannot claim that Ms. Lucas holding the door frame was the reason and justification for them to use force in snatching her out of the house.  This is so because Defendant Rubenstahl had already begun to forcefully pull Becky from the house <u>before</u> she held onto the door frame.  In fact, this use of force, sudden and unexpected, was the reason that Ms. Lucas felt the need to hold the doorway in the first place.

46.     As to the second use of force, the Defendants cannot claim that Ms. Lucas briefly holding the door frame was the reason and justification for them slamming her down on the porch.  This is so because she had already let go of the doorway, she had come fully out onto the porch, and she was standing in an upright position with one officer holding each side of her, <u>before</u> they violently leg-kicked her and threw her down Even if her act of momentarily holding herself up had been an act of non-compliance, that passive non-compliance had ceased, and Ms. Lucas was now fully in compliance and under the officers' control.  The law is clearly established that using force against a compliant arrestee is unreasonable.

47.     Regarding the third use of force, it included the officers coming down on top of her, and Defendant Rubenstahl placing his knee in the Plaintiff's back and pushing his body weight down. Ms. Lucas's earlier act of holding the doorframe as she was being pulled from her house would have no relevance to this use of force.  It would not excuse this later gratuitous violence.

### 4.  Things That Were Not Alleged in the Defendants' Police Reports

48.     It is valuable to point out what Officers Rubenstahl and Martin did not allege against Ms. Lucas.  The three items listed above are the only alleged "misconduct" upon which the officers rely to support all of the various force they used.  Many acts which are routinely alleged in such situations were not alleged here.  Some important examples of actions the officers did not assert establish these facts:

(1)     Ms. Lucas never yelled and screamed at the officers or others at any time;

(2)     Ms. Lucas did not curse at, or insult, the officers at any time;

(3)     Ms. Lucas never made any threatening statements;

(4)     Ms. Lucas never pulled her hands away, or attempted to pull her hands away, from the officers at any time;

(5)     Ms. Lucas never pushed, grabbed, or pulled on either officer at any time;

(6)     When she came out on the porch, Ms. Lucas never struggled with the officers, or engaged in any resistive movements of any kind;

(7)     After being thrown to the ground, and during the handcuffing, Ms. Lucas never struggled with the officers, or engaged in any resistive movements of any kind;

(8)     Ms. Lucas never struck or attempted to strike either officer;

(9)     Ms. Lucas never kicked or attempted to kick either officer;

(10)    Ms. Lucas was never suspected of being under the influence of alcohol;

(11)    There were at all times two officers in contact with a single, unarmed arrestee;

(12)    There were no bystanders or other civilians present, nor was this a tense, uncertain and rapidly evolving situation requiring split second decisions about the reasonableness of the force used.

These are all uncontested facts which collectively weigh heavily against the reasonableness of any use of force, much less the severe, injurious violence done to Becky Lucas.  The offense at issue was a minor, nonviolent one.  She never posed any immediate threat to the safety of the officers.  She never actively resisted the arrest.  No force as necessary.  Under the totality of the circumstances, the degree of force the Defendant officers used was undoubtedly unjustified.

## E.  Grievous Bodily Injuries

49.    As soon as her right side struck the porch, Ms. Lucas felt excruciating pain and knew she had been injured.  Only seconds later she told the police officers she was hurt and needed medical assistance.  They instructed Becky to get up into the chair.  She explained that she could not.  They told her to bend her knees and stand.  She told them she could not do so.  Ms. Lucas was crying from the pain.  The Defendants lifted her up and put her into a chair.  When asked what hurt she mentioned her shoulder and her hip.

50.    After the medics arrived, they found that Ms. Lucas needed to be taken directly to the hospital.  This required Ms. Lucas to stand and take a few steps from the porch to the gurney.  She found she could not stand without support from the medics and could barely move her legs.  They assisted her to the gurney, wheeled her to the ambulance, and drove her to the emergency room. The Defendant police officers kept

20

her in custody through the trip to the hospital and after she had been taken into the emergency room.  She arrived at the hospital at about 8:00 p.m., but the Defendant officers remained in the room with her the entire time.  They did not take off the handcuffs until about 9:15 p.m.

51.     At the hospital Becky gave the history of her injuries as "I was slammed to the ground."  She described having "right-sided shoulder pain, midline thoracic and lumbar back pain, right-sided hip pain, left posterior/inferior rib pain."  She rated her pain level as "10 of 10".  Ms. Lucas tested positive for chest pain, back pain, right shoulder tenderness and right hip tenderness.  During the examination Ms. Lucas was requested to stand but was unable to do so.  She was put in a wheelchair, and later taken by wheelchair to her father's car when he came to pick her up.  She was referred to her primary physician for follow-up.

52.     For the next four weeks Ms. Lucas was unable to walk on her own.  This loss of leg function was due to swelling in her lower back.  She was in a wheelchair or used a walker during those weeks.  Her back/spine care doctor also found acute exacerbation of chronic low back pain and degenerative disc disease, which was not present before her February 20 incident.

53.     The day after her arrest Ms. Lucas had bruising on her right arm, showing where the Defendants had held her arm so forcefully that their fingers left bruises.  She also had a large bruise where Defendant Martin kicked her right leg during their takedown maneuver.  Attached as Exhibit 5, 6 and 7 are photographs of Becky's arm taken three days after the arrest.

54. Regarding her right shoulder pain Ms. Lucas was referred to a specialist. She was having acute, constant pain, and shoulder weakness. An MRI revealed a "traumatic complete tear of the right rotator cuff and a detached bicep muscle." Surgery was performed on April 6, 2022. Ms. Lucas was required to keep her right arm in a sling for six weeks. During that time, she was not permitted to remove it except to bathe. She was given mandatory motion and activity restrictions. She slept upright in a chair from the date of the injury and throughout her recovery from the shoulder surgery. Prior to her incident with the Defendants on February 20, Ms. Lucas had not had any pain or weakness in her right shoulder, and she had never had any prior shoulder surgeries of any kind.

55. About a month after the shoulder surgery Ms. Lucas began a long and intensive series of physical therapy sessions in order to assist in the recovery of her right shoulder, as prescribed by the surgeon. She has had physical therapy sessions and her home therapy regimen regarding her shoulder injury ever since the surgery. The pain levels have slowly decreased over that time, and her strength and range of motion slowly increased. She presently continues her physical therapy sessions and her assigned stretching and movement exercises at home. She still has soreness and aches, but no severe pain.

56. Regarding the injury to her right hip, Ms. Lucas was also referred to a specialist. She began treatment for the right hip pain in March of 2022, a few weeks after the injury occurred. She described the sudden onset of the pain after being thrown down onto concrete and landing on her right hip. She reported constant, moderate to severe lateral pain, sometimes sharp and stabbing, in the right hip, that travelled down

22

the leg some. She also experienced clicking in the right hip. Walking, standing, sitting, and laying on that side aggravated the pain. She had no prior history of hip injuries, pain or surgery.

57. Ms. Lucas was given an array of tests including MRI and ultrasound, revealing a tear in the labrum of the right hip. She has been given a series of injections, sometimes with no pain relief, sometimes with temporary relief. When she was able to walk after the injury, she walked with a limp as a result of the damage on her right side. This uneven gait began to affect her left hip as well. She began physical therapy sessions for her hip pain in about May. Her left hip was starting to have pain.

58. By the end of June, the right hip continued to have constant pain, often sharp pain, and clicking/popping. Her left hip had intermittent pain. She walked with a limp. She was falling more often as a result of her hip giving out.

59. Through the last half of 2022, and into 2023, Ms. Lucas has had periodic lower extremity injections in the right hip. She has continued a course of physical therapy sessions through OSU Wexner Medical Center Rehab Services. She has followed a home physical therapy program as instructed by the doctors and therapists. The tendinopathy of her right gluteal region, right hip pain, muscle weakness, impaired mobility and difficulty walking all remain, although there have been periods of somewhat improved mobility. Her hip doctor has scheduled her for surgery on March 3, because the pain continues, and he advised there will be further surgeries thereafter.

60. Regarding the injury to her back, as indicated above, Ms. Lucas had been diagnosed with spondylosis and degenerative disc disease since approximately 2006. Her back doctor had been monitoring and treating these conditions and helping Becky

to manage the chronic pain they sometimes created.   Prior to the force used by Defendants Rubenstahl and Martin on February 20, 2022, these conditions were responding to conservative treatment, Becky was able to work full-time and engage in her normal activities.   After that date, her physician found that Ms. Lucas's condition had been aggravated by the police injury.   She has not been able to work since that event. She is suffering sharp right axial low back pain.   The severity of the pain is 10 of 10 at times.   The pain is worse with lumbar twisting or exertion.   These aggravated symptoms are continuing and ongoing.   Becky will be receiving an ablation procedure, which burns nerve-endings in her lower back and reduces the transmission of pain to the nervous system. She will also be enrolled in a water therapy program.   Her back specialist has discussed possible surgery, but the risks are so substantial that they have delayed a decision on this.

61.     Regarding the injury to her ribs on the left side, as indicated above, Ms. Lucas was experiencing severe pain in her left posterior rib area when she arrived at the emergency room after the Defendants' uses of force upon her.   This pain began after she landed on the porch on her right side and the officers came down on top of her striking her left side.   Subsequently, x-rays found no breaks in the ribcage.   Becky had pain and soreness in this area which was quite severe for the first month after the incident, gradually decreasing until she was pain-free in that area about three months after the injury.

62.     In addition to the primary injuries to her back, hips, right shoulder and left rib area, Ms. Lucas also had injury and periods of extreme pain to her neck, and injury to her right elbow, as a result of the police uses of force.   All of the injuries and resulting

24

symptoms discussed herein were directly and proximately caused by the actions of Defendants Rubenstahl and Martin at the Plaintiff's home on the evening of February 20, 2022.

63. These physical injuries have had a profound negative effect on Becky Lucas's life, her enjoyment of life, her ability to conduct her normal activities, her ability to work, and her state of mind. These are damages which were also proximately caused by the Defendants.

64. For example, since the incident in February of 2022 Ms. Lucas has lived in a constant state of sleep deprivation. There have been nights when she was unable to go to sleep at all due to the pain and discomfort. On most nights her sleep is intermittent and since the incident Ms. Lucas has averaged only about 4-5 hours of sleep per night. Prior to the police injuries, Becky routinely got about 8 hours of sleep each night. The cumulative consequences of her extended lack of sleep have been significant. She is drained of physical, mental and emotional energy.

65. Prior to the date of her injuries, Becky Lucas routinely provided care and assistance to her parents. They live very close by. Beck's mother now suffers from dementia, and Becky was able to assist her in many ways. She drove her mom to doctor appointments, to buy groceries, and on numerous other errands which her mother is no longer able to do on her own. Becky cut her parents' grass, cleaned their house, and got meals for them. She was routinely at their home several days a week to provide some form of assistance. Since the Defendants injured her, she has not been able to do these things in the manner she previously had. For the first few months, Becky was on a walker, and then in a sling, and was able to be of no help at all.

Particularly after her shoulder was mostly healed, Ms. Lucas has resumed some of her helpful activities, but she is still not able to provide her parents with the level of care and support that she did before the injuries.

66.     The amount of time that Ms. Lucas has been able to spend with her daughter and her grandchildren has actually been about the same as it was before the injuries occurred, and they have been both concerned and supportive to her.  However, the Plaintiff has not been able to engage in many of the activities that they shared previously.  For example, for months she could not pick up her grandkids at all, and even now she can only do so when she's sitting down.

67.     Ms. Lucas has been unable to work since the night of her injuries.  This has been documented in writing by her various physicians.  At the time she was hurt by the Defendants, her job as a cleaning supervisor through Goodwill Industries paid her $600.00 per week plus overtime.  After missing about 3 weeks of work, Goodwill advised her she should voluntarily resign rather than be terminated, and she did so.  Her ongoing hip and back symptoms will continue to prevent her from obtaining gainful employment for some time in the future.

68.     The severe injuries that Ms. Lucas suffered at the hands of Defendants Rubenstahl and Martin are not only relevant to the issues of her damages, they are also an important factor in support of §1983 liability.  The severity of a plaintiff's injuries are relevant to the question of whether an officer's use of force was unreasonable.  <u>La Plante v. City of Battle Creek, Michigan</u>, 30 F.4th 572 (6th Cir. 2022); <u>Scheffler v. Lee</u>, 725 F. Appx. 239, 250 (6th Cir. 2018) ("an excessive force claim may be established through evidence of severe injury") (quoting <u>Morrison v. Bd. of Trs. of Green Twp</u>., 583

F.3d 394, 407 (6th Cir. 2009)).  The officers were merely there to serve a warrant on a low-level, nonviolent misdemeanor offense.  Even if we accepted the Defendants' version of the facts the Plaintiff would have been, at most, passively resistant, and stopped being so before the force was used.  This extraordinarily injurious police violence was beyond unreasonable.  The "criminal mischief" complaint which was the basis of this arrest warrant was subsequently dismissed.

## F.  The Officers Filed a False Criminal Charge

69.    Immediately after completing the arrest of Ms. Lucas, Defendants Rubenstahl and Martin walked off the porch and advised the other officers present that, in addition to the warrant for "criminal mischief," she was being arrested for "resisting arrest."  This charge was based upon the same false scenario Defendant Rubenstahl later included in his police report, where he claimed:

> I advised Ms. Lucas she was under arrest.  She attempted to retreat into the residence and shut the door.  I grabbed Ms. Lucas's right arm and began pulling her out of the residence. . . Ms. Lucas grabbed the door frame in an attempt to prevent us from placing her under arrest.

70.    This charge was brought without probable cause.  Ms. Lucas was not told she was under arrest when she came to the door.  She was immediately grabbed and subjected to a forceful, painful attempt to pull her from the house.  She was told she was under arrest only after this unnecessary and unwarranted violence was occurring. When Defendant Rubenstahl grabbed her right arm Ms. Lucas never made any effort or attempt to pull it away. She did grab the doorframe momentarily with her left arm, in order to prevent falling and protect herself from injury, but she quickly let go.

71.    In fact, if the officers had simply told her that they had a warrant for her arrest, and explained what it was about, Ms. Lucas would have voluntarily agreed to go

to the police station with them.  But the Defendants never gave her the opportunity to comply with their directions by submitting peacefully.  A non-violent arrest was not an option for Becky.  The Defendants foreclosed this by grabbing and jerking on Ms. Lucas's arm and torso at the same time they were telling her she was under arrest. Even then, the Plaintiff at no time tried to pull herself free from the officers' grasp.

72.    The criminal charge for "resisting arrest" is attached as Exhibit 8.  It alleges that Ms. Lucas did "recklessly or by force . . . resist or interfere with the lawful arrest of . . . herself . . . by attempting to pull away from officers, after being advised that she was under arrest," a 2nd degree misdemeanor.  Ms. Lucas was held in custody on this charge from the time of her arrest at 7:36 p.m. until 9:15 p.m., when her handcuffs were removed at the hospital and she was released from police custody.

73.    Ms. Lucas was thereafter required to obtain counsel.  She pled not guilty, several court appearances were scheduled, and this charge hung over Becky's head until July 19, 2022 when the resisting arrest charge was dismissed.

## FIRST FEDERAL CLAIM – UNREASONABLE USES OF FORCE IN VIOLATON OF THE FOURTH AMENDMENT

74.    The Defendants' violent snatching of Ms. Lucas and pulling her from her house constituted an unreasonable and unnecessary use of force, in violation of the Fourth Amendment and 42 U.S.C. §1983.

75.    The Defendants' violent slamming of Ms. Lucas down onto the porch of her home constituted an unreasonable and unnecessary use of force in violation of the Fourth Amendment and 42 U.S.C. §1983.

76.    The Defendants' forcefully landing on Ms. Lucas after she hit the porch, pulling her from her side onto her stomach, and then pressing down on her back while pulling

28

her arms to her back and cuffing them constituted an unreasonable and unnecessary use of force, in violation of the Fourth Amendment and 42 U.S.C. §1983.

## SECOND FEDERAL CLAIM – PROSECUTION WITHOUT PROBABLE CAUSE IN VIOLATION OF THE FOURTH AMENDMENT

77.    The Defendants caused Ms. Lucas to be prosecuted without probable cause for the crime of "resisting arrest," for which she was held in custody, and which was terminated favorably to the Plaintiff, constituting a violation of the Fourth Amendment and 42 U.S.C. §1983.

## THIRD FEDERAL CLAIM – *MONELL* CLAIM FOR MUNICIPAL LIABILITY

78.    The unlawful acts of the individual Defendants herein were proximately caused by policies and customs of Defendant City of Reynoldsburg, including the inadequate training and supervision of police officers, reckless hiring and retention of persons as police officers, and the customary tolerance of or acquiescence to police misconduct, including inadequate disciplinary consequences for federal rights violation and tolerance of falsified police reports.  In addition, officials with final decision making authority, up to and including the Chief of Police, approved of and ratified these customs and policies and the illegal actions taken herein, and the moving force behind the acts and omissions of Defendants Rubenstahl and Martin was their knowledge that their supervisors and the City had their back, and would not discipline them for constitutional violations.

79.    At the scene, as described above, Defendants Rubenstahl and Martin both spontaneously took steps which assured that anything they said about their uses of force upon Becky Lucas would not be captured on their body-worn-camera recordings.

They did this in the immediate presence of other officers, including supervisory personnel.  None of those other officers instructed them to keep their cameras on, or reported them for selective failure to record.  Neither officer was criticized, disciplined, or retrained for turning off their cameras.  After discussing their uses of force, both Defendant officers turned their audio/visual systems back on. This course of conduct, engaged in openly, suggests that such conduct is customary practice in the Reynoldsburg Police Department.  Departmental policies regarding recording of incidents were known to be routinely violated by Reynoldsburg officers.

80.    Although Ms. Lucas suffered serious injuries which were reported immediately, and even though she reported to everyone she spoke with on the night of the incident that she had been subjected to violence unnecessarily, the Reynoldsburg Police Department conducted no investigation of the Defendants' forceful actions toward Ms. Lucas.  There were no internal affairs reviews of this incident, and the force used by the officers was simply approved up the chain of command.

81.    This was not the first time that Reynoldsburg police officers had engaged in this specific form of excessive force.  The identical "snatch and slam" takedown maneuver was used on a fully compliant, innocent homeowner named Danny Smith.  It resulted in a lawsuit, <u>Daniel L. Smith, et al. v. The City of Reynoldsburg, et. al</u>, Case No. 2:19-cv-3554, Southern District of Ohio, Eastern Division, Judge Watson.  The facts of that case mirror the facts of the present case precisely.  Mr. Smith's complaint, describing what happened when a group of six Reynoldsburg officers came to his house one night, reads in pertinent part as follows:

> 39.    . . . with his hands in the air, Danny Smith asked again "why are you here," but they would not tell him.  They kept ordering him

forcefully to "come outside." . . . Mr. Smith . . . stepped outside onto the upper step leading down to the ground. . . .

40. As he started down the stairs, Mr. Smith was physically attacked by Defendant Shively. This officer rushed forward, grabbed Mr. Smith by his right arm, turned him slightly toward the Plaintiff's left and slammed him face-first down to the ground. This was done very quickly and with great force. Shively twisted the Plaintiff's right arm up and back, pulling it so severely that it caused Mr. Smith to cry out in pain, and resulting in physical injuries to Mr. Smith's right shoulder which remain to this day.

41. A second policeman believed to be Officer Aamodt grabbed Mr. Smith's left arm and pulled it up and back as well. Mr. Smith felt one or more knees strike him in the back, and a heavy weight pushing him downward against the ground. The Defendants put cuffs on him, in the rear. As he lay there under the officers Mr. Smith was experiencing sharp pain in the right shoulder area, and he subsequently told the officers that they had injured him.

82. At the time Mr. Smith was seized, thrown down, and injured, there were four other Reynoldsburg police officers present at the scene. None of them intervened to stop the violence against Mr. Smith. None of them reported that they had observed the two officers involved using excessive or unnecessary force. Rather, the physical assault on Mr. Smith was witnessed and supported by all the other officers on scene.

83. Although Mr. Smith suffered serious injuries and alleged unnecessary force was used during his arrest, the Reynoldsburg Police Department conducted no investigations or internal reviews of the violence done to Mr. Smith. None of the officers who injured Danny Smith, nor the others who were present and failed to intervene or report it, were criticized, disciplined or otherwise made accountable for their actions. Mr. Smith's litigation was settled favorably to him in 2020.

WHEREFORE, the Plaintiff demands judgment against the Defendants, jointly and severally, for compensatory damages, punitive damages against the individual

Defendants, reasonable attorney fees, costs, and such other relief as the court may deem appropriate.

Respectfully submitted,

_/s/ James D. McNamara_
James D. McNamara    (0002461)
Trial Attorney for Plaintiff
88 E. Broad Street, Suite 1350
Columbus, OH 43215
(614) 464-2770
psilbach@yahoo.com

_/s/ John S. Marshall_
John S. Marshall       (0015160)
Co-counsel for Plaintiff
MARSHALL AND FORMAN LLC
250 Civil Center Dr., Suite 480
Columbus, OH 43215
(614) 463-9790
jmarshall@marshallforman.com

## JURY DEMAND

The Plaintiff hereby demands a jury of eight persons to hear and decide this case.

_/s/ James D. McNamara_
James D. McNamara    (0002461)
Trial Attorney for Plaintiff