**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**REBECCA LUCAS,**

      **Plaintiff,**

                      **Case No. 2:23-cv-689**
**v.**                      **Judge Edmund A. Sargus, Jr.**
                      **Magistrate Judge Kimberly A. Jolson**

**THE CITY OF REYNOLDSBURG, *et al*.,**

      **Defendant.**

## OPINION AND ORDER

This matter is before the Court on cross-motions for summary judgment filed by Plaintiff Rebecca Lucas (ECF No. 37) and Defendants The City of Reynoldsburg, Officer Nicholas Rubenstahl, and Officer Ryan Martin (ECF No. 41). For the reasons stated in this Opinion and Order, the Court **DENIES** Ms. Lucas's Partial Motion for Summary Judgment (ECF No. 37) and **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion for Summary Judgment (ECF No. 41). Only Ms. Lucas's excessive use of force claim against Officer Rubenstahl can continue.

## BACKGROUND

A neighbor accused Ms. Lucas of tampering with a small "no trespassing" sign on the neighbor's property on February 3, 2022. (Rubenstahl Dep., ECF No. 30-1, 133:2–134:15.) The neighbor filed a complaint in the Reynoldsburg Mayor's Court, and an arrest warrant was issued for Ms. Lucas for criminal mischief, a misdemeanor offense. (*Id.*) Reynoldsburg Police Department Officer Nicholas Rubenstahl attempted to serve the warrant on Ms. Lucas on February 19, but he did not make contact with her. (*Id.* at 139:7–141:1.)

The next day, February 20, Ms. Lucas's neighbor, John Harber (possibly the same neighbor as described above), came to the Reynoldsburg police station and made a report regarding Ms.

Lucas to Officer Ryan Martin. (Martin Dep., ECF No. 34-1, 9:11–14; Martin Report, ECF No. 34-3, PageID 1276.) In the afternoon of February 19, Mr. Harber recorded Ms. Lucas with his phone after a dispute arose regarding Ms. Lucas's dogs, which were "aggressive" according to Mr. Harber. (Martin Report, PageID 1276.) Ms. Lucas "mooned" Mr. Harber and other neighbors in response while standing in her driveway. (*Id.*) Mr. Harber reported that Ms. Lucas has access to multiple firearms and that, at some point, she showed and "racked" them "at the neighbors." (*Id.*; Martin Dep., 137:18–138:3.)

Around 7:30pm that night, Officer Rubenstahl returned with Officer Martin to arrest Ms. Lucas, to serve the warrant on her, and to investigate her for public indecency. (Rubenstahl Dep., 137:24–138:5, 152:13–19; Martin Dep., 156:34–159:16, 162:5–10.) It was a February evening in Ohio, so it was already dark outside. (Martin Dep., 152:10–19.) Before approaching Ms. Lucas's door, Officer Martin informed Officer Rubenstahl and other officers that Ms. Lucas "was known to possess firearms and had aggressive animals." (Martin Report, PageID 1276.) Officer Martin knocked on Ms. Lucas's front door multiple times, received no response, and moved away to knock on a nearby window. (*Id.*; Martin Dep., 164:20–165:18.) Officer Rubenstahl then approached Ms. Lucas's front door alone and knocked, announcing that he was with the Reynoldsburg Police Department and that he wanted to talk to Ms. Lucas. (Rubenstahl Dep., 184:18–185:23.) He reported seeing a sign next to Ms. Lucas's front door depicting a firearm and stating that the resident is armed. (*Id.* at 182:6–11.) Officer Rubenstahl testified that this sign was "an officer safety concern." (*Id.* at 183:7–184:17.)

According to Ms. Lucas, when she came to the front door and opened it,

[Officer Rubenstahl] grabbed the door out of my hand, then he grabbed me. Then he forcibly pushed me up against the door frame with him having his wrist in his hand and he pulled me out onto the porch. And then Officer Martin joined in and they kicked my leg out from underneath me and slammed me to the ground. And at

2

no time, any of that, did they tell me what was going on, why they were there for, what I had done wrong, and none of that was explained to me.

(Lucas Dep., ECF No. 29-1, 108:5–14.)

## I. First Action: Officer Rubenstahl Grabs Ms. Lucas's Arm and Pulls Her Out of the House

Defendants filed Officer Rubenstahl's and Officer Martin's body-worn camera ("BWC") videos from the night of the incident in support of their Motion for Summary Judgment. (*See* ECF No. 12.) The video footage of the incident is dark, lit by dark blue lights on Ms. Lucas's porch, and at times obscured, but it substantially assists the Court in evaluating the Parties' cross-motions.

As shown in Officer Rubenstahl's BWC video, Ms. Lucas opened the wooden front door of her house inward and pushed open a glass door outward with her right arm toward Officer Rubenstahl. (Rubenstahl BWC, 19:36:35–40.)[1] Officer Rubenstahl stated, "Hi. Rebecca?" and further pulled open the glass door. (*Id.* at 19:36:39–42.) In an affidavit, Ms. Lucas stated that when Officer Rubenstahl pushed the storm door open further before moving to grab her arm, her hand "dropped from the storm door just before he grabbed my wrist or forearm." (Lucas Aff., ECF No. 37-1, ¶ 10.) Around the same time, Ms. Lucas stated "why?" or "what?" (*Id.*)

In Officer Rubenstahl's estimate, Ms. Lucas "took one and a half steps" back into the residence after he moved his hand toward her arm. (Rubenstahl Dep., 194:20–195:5.) He grabbed onto her arm "pretty quickly," and "began pulling her out of the residence." (*Id.* at 196:2–6.) He stated "come step out here with me, OK?" (Rubenstahl BWC, 19:36:40–47.) Officer Rubenstahl's force caused Ms. Lucas's body to pivot toward the right side of the door frame, and she grabbed onto it with her left arm. (Rubenstahl Dep. at 197:4–16.) Once Ms. Lucas was in the doorway between the house and the front porch, Officer Rubenstahl stated, "you are under arrest."

---

[1] Timestamps are from the top right corner of the BWC videos.

(Rubenstahl BWC, 19:36:40–47.) Ms. Lucas testified that Officer Rubenstahl "forcibly pushed me up against the door frame with him having my wrist in his hand and he pulled me onto the porch." (Lucas Dep., 108:3–14.) She added, "[a]s I was being pulled, I grabbed [the doorframe] briefly to keep from falling on – to the ground, keep my balance." (*Id.* at 144:8–11.)

From the time Ms. Lucas opens her front door to when Officer Rubenstahl starts pulling her out of the house, about three seconds pass. (Rubenstahl BWC, 19:36:39–42.)

## II.     Second Action: Officer Rubenstahl and Officer Martin Take Ms. Lucas to the Ground

While Officer Rubenstahl was pulling Ms. Lucas out of the house and onto the porch, Officer Martin entered the porch area. He seized Ms. Lucas's right arm and assumed Officer Rubenstahl had secured Ms. Lucas's left arm. (Martin Dep., 181:4–19.) Officer Martin yelled "get on the fucking ground." (*Id.* at 191:6–21; 192:17–24.) He did not ask Ms. Lucas to get on the porch voluntarily or to place her hands behind her back for handcuffing. (*Id.* at 196:7–20.) And no such commands can be heard on the BWC videos.

The group fell to the ground after Officer Martin joined in. Officer Rubenstahl testified that he did not use his full body weight and did not intend to perform a takedown on Ms. Lucas— rather, the momentum of removing Ms. Lucas from the house, Ms. Lucas's grip on the door frame, and the "forceful pulling and breaking loose of that door frame is what took us to the ground." (Rubenstahl Dep., 213:24–214:22; 216:8–217:23.) Officer Martin testified that he intentionally performed a "double arm bar takedown" on Ms. Lucas. (Martin Dep., 184:1–186:24.)

Ms. Lucas stated that she was standing on the porch for about two or three seconds before the officers took her to the ground. (Lucas Aff., ¶ 19.) She testified that "Officer Martin joined in and they kicked my leg out from underneath me and slammed me to the ground." (Lucas Dep., 108:3–14.) She stated that she landed on her right side and was not able to protect herself when

she struck the concrete because the officers were still holding both of her arms as she went down and hit the porch. (Lucas Aff., ¶ 22.)

As shown in Officer Martin's BWC video, from his vantage point, the front porch was obscured by a tarp hanging across the porch entrance. (Martin BWC, 19:36:38–42.) After Ms. Lucas opened the door, Officer Martin walked toward the front porch and pushed aside the tarp. (*Id.* at 19:36:40–44.) Behind the tarp, the video shows Officer Rubenstahl physically engaged with Ms. Lucas in the threshold between the house and the porch. (*Id.*) Officer Martin quickly approached and grabbed onto the group, but the video is unclear about what happened after that point because the officers and Ms. Lucas were close together, obscuring the camera's view.

From the time Officer Rubenstahl starts pulling Ms. Lucas out of the house to when the officers take her to the ground, about six seconds pass. (Rubenstahl BWC, 19:36:42–48.) The takedown occurs about nine seconds after Ms. Lucas opened the door. (*Id.* at 19:36:39–48.)

## III.     Third Action: Officer Rubenstahl's Weight and Knee on Ms. Lucas's Back

After Ms. Lucas landed on the ground on her front porch, Officers Rubenstahl and Martin turned her face-down and began to handcuff her. (Rubenstahl Dep., 218:10–22.) Ms. Lucas stated that while Officer Rubenstahl was handcuffing her, he pushed his knee hard into her lower back where she has chronic pain. (Lucas Aff., ¶ 23.) After she was handcuffed, Ms. Lucas complained of back and hip pain and was unable to stand on her own. (Lucas Dep., 221:16–222:9.) The officers lifted her into a chair and called for a medic, and she was taken to an emergency room by squad car. (*Id.* at 223:12–21; Martin Dep., 236:2–237:2.) Officers Rubenstahl and Martin followed Ms. Lucas to the hospital and served her arrest papers there. (Martin Dep., 236:10–22.)

## IV.     After the Incident

The officers initiated a prosecution of Ms. Lucas for resisting arrest based on the incident

at her front door. (Rubenstahl Dep., 250:12–23.) Ms. Lucas contends that the resisting arrest charge was later dismissed. (ECF No. 44, PageID 2085.) After the arrest, Ms. Lucas received surgeries on her hip, shoulder, and elbow. (Lucas Dep., 58:17–61:7.)

Ms. Lucas sued the City of Reynoldsburg, Officer Rubenstahl, and Officer Martin. (ECF No. 1.) Under 42 U.S.C. § 1983, she claims Officers Rubenstahl and Martin used excessive force on three occasions during her arrest in violation of the Fourth Amendment to the U.S. Constitution's prohibition on unreasonable seizures. (*Id.* ¶¶ 74–76.) She also brings a Fourth Amendment malicious prosecution claim against Officer Rubenstahl under § 1983 based on the resisting arrest charge. (*Id.* ¶ 77.) Last, Ms. Lucas brought a municipal liability claim against the City of Reynoldsburg under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), but she has since abandoned that claim. (*Id.* ¶¶ 78–83; ECF No. 44, PageID 2088.)

Ms. Lucas filed a Motion for Partial Summary Judgment on her three use of force claims. (ECF No. 37.) Defendants filed a response in opposition. (ECF No. 45.) Ms. Lucas replied. (ECF No. 50.) Defendants filed a Motion for Summary Judgment on all claims. (ECF No. 41.) Ms. Lucas responded in opposition. (ECF No. 44.) Defendants replied. (ECF No. 51.)

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). To avoid summary judgment, the nonmovant "must do more than simply show that there is some

metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Parties cross-moved for summary judgment. Each party, as a movant, bears the burden of meeting the summary judgment standard. *Ray v. McCloud*, 507 F. Supp. 3d 925, 930 (S.D. Ohio 2020) (Watson, J.). The failure of one party to carry its burden does not mean that the other party should prevail on its motion; rather, the Court should "evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994).

## ANALYSIS

The Court begins with Ms. Lucas's use of force claims before addressing the malicious prosecution claim. Since Ms. Lucas has abandoned her *Monell* claim against the City of Reynoldsburg, that claim is **DISMISSED without prejudice**, and no claims remain against the City.

### I.    Use of Force During Arrest

Ms. Lucas alleges three instances of unreasonable and excessive use of force: (1) her removal from her home by Officer Rubenstahl; (2) her takedown onto the ground by Officers Rubenstahl and Martin; and (3) the forceful pressure Officer Rubenstahl applied to her back while she was being handcuffed. (ECF No. 37, PageID 1281.) She moves for summary judgment on all three uses of force. (*Id.*) Defendants also move for summary judgment on all three instances. (ECF No. 41, PageID 2037.) The Court assesses them in turn.

### A. Applicable Law

Although "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it," the force used must conform to the Fourth Amendment's proscription against unreasonable seizures. *Graham v. Connor*, 490 U.S. 386, 396 (1989). Courts assess whether an arresting officer used excessive force in violation of the Fourth Amendment under an objective standard of reasonableness based on the perspective of a reasonable officer on the scene. *Id.* at 395–96. Courts look to "the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect pose[d] an immediate threat to the safety of the officers or others, and [3] whether he was actively resisting arrest or attempting to evade arrest by flight." *Gaddis ex rel. Gaddis v. Redford Twp.*, 364 F.3d 763, 772 (6th Cir. 2004) (citing *Graham*, 490 U.S. at 395) (quotation omitted)).

In cases involving multiple uses of force, courts in this circuit analyze each claim separately. *Id.* In doing so, courts should "identif[y] the seizure and procee[d] to examine whether the force used to effect that seizure was reasonable in the totality of the circumstances, not whether it was reasonable for the police to create those circumstances." *Dickerson v. McClellan*, 101 F.3d 1151, 1161 (6th Cir. 1996) (quotation marks and citation omitted). "However, [courts] may consider 'the moments preceding [a] [use of force] as part of the context of that [use of force]." *Gaddis*, 364 F.3d at 772 (quoting *Dickerson*, 101 F.3d at 1162). Because "earlier facts and circumstances may bear on how a reasonable officer would have understood and responded to later ones," the totality of the circumstances test for excessive force "has no time limit." *Barnes v. Felix*, No. 23-1239, slip op. at 5, 605 U.S. __ (2025).

### B. Grabbing and Pulling Ms. Lucas from Her Home

Ms. Lucas argues that Officer Rubenstahl used excessive and unreasonable force when he grabbed her arm and forcibly removed her from her home and onto the front porch after she opened her front door. (ECF No. 37, PageID 1286.) Defendants do not dispute that Officer Rubenstahl used some force and that the grab and removal was a seizure under the Fourth Amendment. (*See* ECF No. 45, PageID 2098–99.) They argue that Officer Rubenstahl was justified in grabbing and removing Ms. Lucas from her house because he had a warrant for her arrest and because when Officer Rubenstahl initially reached for her arm, Ms. Lucas "attempted to retreat back into her home, justifying an escalation." (ECF No. 45, PageID 2098.) With this background in mind, the Court examines the *Graham* factors.

### i. Severity of the Crime at Issue

The severity of the crime at issue weighs against the use of grabbing and pulling force. Officer Rubenstahl came to Ms. Lucas's home to arrest her on a warrant from the Reynoldsburg Mayor's Court for criminal mischief, which is a misdemeanor offense. (Rubenstahl Dep., 133:2–134:15). The warrant arose from Ms. Lucas's neighbor's report that she tampered with a small "no trespassing" sign between the properties. This offense was not severe from the perspective of a reasonable officer on the scene, and there is no allegation that her alleged crime involved violence or injuries. *Graham,* 490 U.S. at 387 (1989); *see LaPlante v. City of Battle Creek*, 30 F.4th 572, 580 (6th Cir. 2022) (finding that a misdemeanor offense of operating a vehicle under the influence of alcohol was "only moderately severe.") Even viewed in the light most favorable to Defendants, the severity of the crime does not demonstrate a need to use any substantial force, such as grabbing and pulling the suspect out of her home without the suspect disobeying an order to do so. *See Vanderhoef v. Dixon*, 938 F.3d 271, 277 (6th Cir. 2019) ("Conduct that is not a violent or serious

crime does not permit an officer to use increased force absent other factors.").

### ii. Whether the Suspect Posed an Immediate Threat

Ms. Lucas's presence and behavior before Officer Rubenstahl grabbed her and removed her from her home does not indicate that she posed an immediate threat to the officers or others. She calmly opened her door after being awaken by Officer Rubenstahl's knock-and-announce, and she asked "why" or "what?" Rather than explaining why he was there and that Ms. Lucas was under arrest, Officer Rubenstahl reached for and grabbed Ms. Lucas's arm within seconds after she opened the door. Whether she then resisted arrest is assessed in the next section, but up to this point, Ms. Lucas did not exhibit any threatening behavior.

Even so, before the arrest, Officer Martin informed Officer Rubenstahl that "Ms. Lucas is known to have several firearms inside the residence" and that she had "aggressive dogs." (Rubenstahl Dep., 162:21–25; 169:9–19.) Officer Rubenstahl heard dogs barking inside the residence after knocking on the door, but he didn't see them or know where they were. (*Id.* at 170:20–171:3.) Additionally, he "observed a sign right by the door stating that the resident is armed and a picture of a firearm," which is confirmed in his BWC video. (*Id.* at 182:6–14.)

Viewed in the light most favorable to Defendants for the purposes of Ms. Lucas's motion, the information about Ms. Lucas's firearms and dogs suggests that Officer Rubenstahl was reasonable to want to quickly get Ms. Lucas out of the house and onto the porch. But those facts do not suggest that it was reasonable to immediately grab her arm and attempt to pull her out without first stating that she was under arrest or ordering her to exit the house. Ms. Lucas's left hand was obscured by the door frame, but Officer Rubenstahl did not see Ms. Lucas reach for anything or make any furtive movements. *See Shumate v. City of Adrian*, 44 F.4th 427, 444 (6th Cir. 2022) ("A reasonable officer would not believe that [the suspect] posed an immediate threat

of harm when there was nothing—no evasive movements towards a waistband, no threats of violence, no charging towards the officer—suggesting possession or intent to possess a weapon."). In fact, Officer Rubenstahl testified that "[s]he never did anything verbally or that we would see that there were officer safety concerns with executing the warrant. . . . She never did anything physical towards us, but she did try and flee back in and take evasive action towards the arrest." (ECF No. 30-1, 211:22–212:6).

Accordingly, this factor is neutral regarding the reasonableness of Officer Rubenstahl's first use of force. The reasonableness turns instead on whether Ms. Lucas attempted to resist arrest or flee.

### iii. Whether Ms. Lucas Was Resisting Arrest or Fleeing

As the Sixth Circuit has explained, different levels of resisting arrest or flight call for different uses of force to effectuate an arrest. *See Moore v. Oakland Cnty.*, 126 F.4th 1163, 1167–69 (6th Cir. 2025). For example, a suspect might be actively resisting arrest, passively resisting, or non-resisting. Active resistance "can be characterized by physical force, a show of force, or verbal hostility coupled with failure to comply with police orders." *Jackson v. Washtenaw Cnty.*, 678 F. App'x 302, 306 (6th Cir. 2017) (citing *Goodwin v. City of Painesville*, 781 F.3d 314, 323 (6th Cir. 2015)). In other words, "[a]ctive resistance includes 'physically struggling with, threatening, or disobeying officers.'" *Rudlaff v. Gillispie*, 791 F.3d 638, 641 (6th Cir. 2015) (citing *Cockrell v. City of Cincinnati*, 468 F. App'x. 491, 495 (6th Cir.2012) (collecting cases)).

"Mere passive resistance, in contrast, entails a 'lack of physical resistance or verbal antagonism.'" *King v. City of Rockford*, 97 F.4th 379, 396 (6th Cir. 2024) (quoting *Jackson*, 678 F. App'x at 306); *Eldridge v. City of Warren*, 533 F. App'x 529, 535 (6th Cir. 2013)). For example, "'a failure to present one's arms to an officer upon request without more' constitutes passive

resistance at most, but 'a physical struggle to maintain control of one's limbs while being placed in handcuffs can be active resistance.'" *King*, 97 F.4th at 396 (quoting *Jackson*, 678 F. App'x at 307).

Although the Court views the facts in the light most favorable to the non-moving party for the purposes of each party's respective motion for summary judgment, the Court will "not accept [a party's] facts to the extent that they are 'blatantly contradicted by the record,'" including the officers' BWC videos. *Mitchell v. Schlabach*, 864 F.3d 416, 418 (6th Cir. 2017) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). The videos do not easily resolve the Parties' factual disputes because they are dark, discolored by Ms. Lucas's blue porch lights, and only show portions of the incident. To the extent they are clear, the Court relies on the BWC videos, in part, to resolve factual disputes between the Parties. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) (establishing the high value of video footage in resolving factual disputes between the parties); *Osborn v. City of Columbus*, No. 22-3570, 2023 WL 2523307, at *7 (6th Cir. Mar. 15, 2023) (Readler, J., concurring in part and dissenting in part).

### 1. Active Resistance

Defendants argue that Ms. Lucas actively resisted arrest by pulling her hand back from Officer Rubenstahl before any contact is made, that she fled from arrest by retreating into the home, and that Officer Rubenstahl's BWC footage corroborates this account of the incident. (ECF No. 45, PageID 2098.) If Ms. Lucas was actively resisting arrest, Officer Rubenstahl was likely justified in grabbing her and removing her from her home. *See Bozung v. Rawson*, 439 F. App'x 513, 521 (6th Cir. 2011) (holding at summary judgment that officers were objectively reasonable in seizing and performing takedown maneuver on suspect who was not compliant with the officers' orders).

Viewed in a light most favorable to Defendants for the purposes of Ms. Lucas's motion, Officer Rubenstahl's BWC video does not blatantly contradict his account of the incident. The video shows Ms. Lucas's right hand moving downward off the storm door when Officer Rubenstahl pushes it more open, and that movement could be viewed as a slight recoiling. Even so, the video does not clearly show whether Ms. Lucas moved backward into the home before Officer Rubenstahl grabbed onto her and began to forcibly remove her from the home. The video shows that Officer Rubenstahl asked Ms. Lucas to "come step our here and talk with me, OK?" only after he grabbed her and started to forcibly move her out of the house. (Rubenstahl BWC, 19:36:40–47.)

Viewed in a light most favorable to Ms. Lucas for the purposes of Defendants' motion, the video does not blatantly contradict her account that her hand passively fell off the door when Officer Rubenstahl pushed it farther open. It also does not clearly establish whether Ms. Lucas moved backward into the home at all or, if she did, whether it was Officer Rubenstahl's use of force that pushed her back into the home. Similarly, the video does not clearly show how Ms. Lucas was holding onto the doorframe, whether she was bracing herself in resistance to Officer Rubenstahl's efforts to remove her from the home, or whether she was otherwise attempting to break free.

Officer Martin's BWC video also does not blatantly contradict either Ms. Lucas's or Officer Rubenstahl's account of the incident. Officer Martin's video only shows a brief, dark, and unclear view of what happened after Officer Rubenstahl pulled Ms. Lucas onto the porch. Officer Rubenstahl is shown holding onto Ms. Lucas and placing his arm on her back or shoulder while she is standing facing the right side of the doorframe in the doorway between her home and the porch. (Martin BWC, 19:36:44–49.) Officer Martin then grabbed onto the two of them, and the

13

whole group fell to the ground. (*Id.*) This video does not conclusively support or blatantly contradict either side's version of the facts regarding whether Ms. Lucas was actively resisting arrest before or during Officer Rubenstahl's initial arm grab and pull. A genuine issue of material fact remains regarding active resistance.

### 2. Passive Resistance

Construed in a light most favorable to Defendants, the record is also unclear whether Ms. Lucas was even passively resisting arrest. Even if she pulled her hand away in response to Officer Rubenstahl moving to grab her arm, that behavior does not rise to "passive resistance" as described by the Sixth Circuit. For example, a suspect passively resists arrest when they refuse to exit a vehicle. *See Moore*, 126 F.4th at 1168. ("Passive resistance, such as merely failing 'to exit a vehicle,' 'does not justify'" the use of force to subdue a suspect. (quoting *Browning v. Edmonson Cnty.*, 18 F.4th 516, 527 (6th Cir. 2021)). Passive resistance to arrest also includes a suspect making a "single statement that he would not leave his apartment, or the fact that he remained in his apartment rather than exiting." *Goodwin v. City of Painesville*, 781 F.3d 314, 324 (6th Cir. 2015).

Here, Officer Rubenstahl did not order or ask Ms. Lucas to exit her home before he grabbed her and began pulling her out of the home. All he said before grabbing her was, "Hi, Rebecca?" Ms. Lucas did not have time to comply with Officer Rubenstahl's request to "come step out here and talk with me" before he began forcibly removing her from the house. (*Id.* at 19:36:40–47.) She hit the ground about six seconds later. (*Id.* at 19:36:48.)

Viewing the facts in a light most favorable to Defendants, it is possible that Ms. Lucas braced herself or attempted to move away from Officer Rubenstahl after he grabbed her arm and asked her to come out onto the porch to talk. But even so, Officer Rubenstahl's initial use of force

began before that request, and a reasonable jury could decide that the use of force was objectively unreasonable considering that Ms. Lucas had no time to comply with it.

Conversely, even viewing the facts in a light most favorable to Ms. Lucas, a reasonable jury could conclude that Officer Rubenstahl's use of force was objectively reasonable under the circumstances, given the possibility of weapons and aggressive dogs in the home, the fact Officer Rubenstahl had a warrant for her arrest, the dark and limited visibility, and the potential that Ms. Lucas moved backward into the home when Officer Rubenstahl moved his hand toward her.

Ultimately, a genuine issue of material fact remains regarding passive resistance.

### 3. Non-Resistance

Next, Defendants rely on the general principle that even if Ms. Lucas was not resisting, "[u]nder the Fourth Amendment, if officers have the right to arrest a suspect for committing a crime . . . they may use *some force* to carry out the arrest." *Gambrel v. Knox Cnty., Kentucky*, 25 F.4th 391, 402 (6th Cir. 2022) (emphasis added) (citing *Graham*, 490 U.S. at 396). But assuming Ms. Lucas was not resisting, that principle alone does not justify the precise use of force in question here.

"[E]ven minor uses of force are unconstitutionally excessive if they are 'totally gratuitous.'" *Gaddis ex rel. Gaddis v. Redford Township*, 364 F.3d 763, 772 (6th Cir. 2004) (quoting *McDowell v. Rogers*, 863 F.2d 1302, 1307 (6th Cir. 1988)). Even viewing the facts in a light most favorable to Defendants, a reasonable jury could conclude that Officer Rubenstahl's initial use of force was gratuitous and unreasonable under all the circumstances if Ms. Lucas was not resisting. But viewing the record most favorably to Ms. Lucas, a reasonable jury could still conclude that Officer Rubenstahl was objectively reasonable for quickly grabbing and moving Ms. Lucas out of the home because of the additional circumstances present as described above.

Defendants rely on a district court's description of dicta in *U.S. v. Kinney*, 638 F.2d 941 (6th Cir. 1981) for the proposition that it was objectively reasonable for Officer Rubenstahl to grab and pull Ms. Lucas out of the home to arrest her solely because (1) he had a warrant for her arrest and (2) she was directly in front of him. (ECF No. 41, PageID 2039 (citing *Baillargeon v. Huber*, No. 1:21-cv-886, 2023 WL 4144733, at *8 (W.D. Mich. June 23, 2023) ("[O]fficers in *Kinney* possessed a warrant to arrest the defendant. Accordingly, they could reach into the defendant's home to make the arrest without running afoul of the Fourth Amendment." (citing *Kinney*, 638 U.S. at 942–43)))).) But in *Kinney*, the issue was whether officers conducted an unreasonable warrantless search of the suspect's apartment, not whether the officers used excessive force in making an arrest. *Kinney*, 638 F.2d at 943–44. The Sixth Circuit's brief description of the suspect's arrest in that case is dicta and thus does not influence this Court's analysis.

Given the disagreement in the witnesses' testimony and the ambiguity in the record about whether Ms. Lucas was not resisting, passively resisting, or actively resisting at the time Officer Rubenstahl grabbed her and pulled her out of the home, a genuine issue of material fact remains for the jury regarding the first use of force.

### C. The Officers' Takedown of Ms. Lucas

Ms. Lucas next claims that Officers Rubenstahl and Martin both used excessive force in effectuating a takedown that caused her injuries on the right side of her body when she struck the ground on her front porch. As described above, when Officer Rubenstahl continued to pull Ms. Lucas out toward the porch, Officer Martin joined in to accomplish an "arm bar takedown" of Ms. Lucas onto the ground.

### i.  Applicable Law – Takedown

Whether the force used take Ms. Lucas to the ground was reasonable also depends on

whether and to what degree Ms. Lucas was resisting arrest or refusing to comply with the officers' commands. Officers may not subdue a "non-violent, non-resisting, or only passively resisting suspect" with physical force such as tasing, pepper-spraying, or beating them. *Moore v. Oakland Cnty., Michigan*, 126 F.4th 1163, 1168 (6th Cir. 2025) (quoting *Smith v. City of Troy*, 874 F.3d 938, 945 (6th Cir. 2017) (per curiam)). Use of similar force, such as a takedown technique, is permissible where, for example, the suspect resists arrest, refuses repeated commands to put his hands behind his back, and refuses to be handcuffed. *Earnest v. Genesee Cnty., Michigan*, 841 F. App'x 957, 960–61 (6th Cir. 2021).

### ii.  Officer Rubenstahl's Use of Force

Before Officer Rubenstahl and Officer Martin took Ms. Lucas to the ground, Officer Rubenstahl gave only one verbal order, which was for Ms. Lucas to "come step out here and talk with me, OK?" (Rubenstahl BWC, 19:36:40–47.) He made that request only after he initiated the first use of force and began pulling her out of her house. It is unclear from the record whether or when Ms. Lucas started to actively or passively resist that order. Furthermore, Officer Rubenstahl testified that Ms. Lucas did not try to punch, hit, kick, or grab the officers, did not scream out or verbally refuse an order, and "never did anything physical towards us." (Rubenstahl Dep., 210:24–212:6.) He also testified that he pulled Ms. Lucas with enough force that when she stopped holding on to the doorframe, the momentum of his force caused them to fall to the ground. (*Id.*)

Ms. Lucas's and Officer Rubenstahl's accounts of whether she was trying to move back into the home differ, and the officers' BWC videos do not blatantly contradict either account. The videos also do not resolve the issue because it is difficult to see what happened. As the officer who made face-to-face contact with Ms. Lucas, Officer Rubenstahl was aware that she made no threats or other indications that she posed a safety threat. And even though Officer Rubenstahl testified

that Ms. Lucas moved slightly backward and resisted his efforts to move her out of the house, Ms. Lucas testified that she did not resist or flee at all. The record does not contradict or clearly support either version of the facts. Construed in a light most favorable to Defendants, a reasonable jury could still conclude that Ms. Lucas did not actively or even passively resist Officer Rubenstahl's efforts to move her from the house to the porch. Construing the evidence in favor of Ms. Lucas, reasonable jurors also could still conclude that Ms. Lucas at least passively resisted arrest.

Ultimately, a genuine issue of material remains about whether Ms. Lucas actively or passively resisted arrest when Officer Rubenstahl applied enough force to pull her to the ground. Testimony and other evidence at trial could help a jury decide whether Officer Rubenstahl's actions were reasonable in light of his and Ms. Lucas's actions and his knowledge of the situation at the time, including the low severity of the crime at issue, the potential safety concerns regarding firearms and dogs, and the lack of any immediate threat posed by Ms. Lucas.

### iii. Officer Martin's Use of Force

From Office Martin's vantage point near the corner of the house, he could hear Officer Rubenstahl say, "Hi, Rebeccca?" and then heard "what [he] believed to be a scuffle or something physical" after the front door opened. (Martin Dep., 167:4–168:11.) When Officer Martin moved the tarp and entered the porch area, he "observed a physical struggle between Officer Rubenstahl and Rebecca" and "consider[ed] that resistive." (*Id.* at 184:12–24.) Officer Martin testified that Ms. Lucas did not strike, punch, slap, kick, or hit him, that he did not observe her doing any of that to Officer Rubenstahl, and that Ms. Lucas made no verbal threats. (*Id.* at 175:15–177:16.) Although Officer Martin's BWC video is unclear regarding what force Officer Rubenstahl was using on Ms. Lucas and whether Ms. Lucas was resisting that force, the video does not blatantly contradict Officer Martin's account of those events.

18

Construing the record in a light most favorable to Defendants, Officer Martin had reason to believe that Ms. Lucas was actively resisting arrest given that Officer Rubenstahl was forcibly pulling her out of the house and, in his quick moment's view, might have been physically struggling to do so. Even though Ms. Lucas did not appear to be kicking, punching, yelling, or otherwise attempting to harm Officer Rubenstahl or others, a reasonable officer under the circumstances could believe that Officer Rubenstahl was engaged in a physical struggle with Ms. Lucas and that she was actively resisting arrest. Officer Martin's knowledge that Ms. Lucas was known to possess firearms and aggressive dogs reasonably elevated his safety concerns. Additionally, unlike Officer Rubenstahl, Officer Martin did not witness Ms. Lucas's essentially passive or non-resistant behavior at the start of the interaction when she opened the door. In such a situation, the Court cannot second guess Officer Martin's split-second decision to join in and perform a takedown maneuver to ensure the suspect's compliance and protect officer safety.

Construing the record in a light most favorable to Ms. Lucas, Officer Martin's account of the incident is still supported by the BWC video, and his actions were still reasonable under the circumstances for the same reasons. Accordingly, there is no genuine issue of material fact that, from the perspective of a reasonable officer under the circumstances, Officer Martin's takedown maneuver was an objectively reasonable use of force under the Fourth Amendment. Therefore, the Court **GRANTS** Defendants' Motion for Summary Judgment as to the use of force claim against Officer Martin and **DENIES** Ms. Lucas's Motion for Summary Judgment as to the same. No claims remain against Officer Martin.

### D.  Officer Rubenstahl's Knee to Ms. Lucas's Back

In the Sixth Circuit, "an officer may not use additional gratuitous force once a suspect has been neutralized." *Morrison v. Bd. of Trustees*, 583 F.3d 394, 408 (6th Cir. 2009) (quoting

*Alkhateeb v. Charter Twp. of Waterford*, 190 F. App'x 443, 452 (6th Cir. 2006)). Ms. Lucas claims Officer Rubenstahl used excessive force by pressing his knee into her back when she was on the ground because she was compliant and not resisting. (ECF No. 37, PageID 1320.)

After Ms. Lucas hit the ground, the officers turned her so that she was facing the ground to handcuff her. (Rubenstahl Dep., 218:10–22, 319:21–320:7.) Ms. Lucas stated that after the takedown, "Officer Rubenstahl took my arm to begin handcuffing me. When he did that he pushed his knee hard into my lower back and then pressed me down with his body weight." (Lucas Aff., ¶ 23.) At his deposition, Officer Rubenstahl did not remember using force to hold her down but also did not deny that he used his body weight to hold Ms. Lucas on the ground while she was being handcuffed. (Rubenstahl Dep., 218:10–219:5.) Officer Rubenstahl was not asked specifically about whether he placed his knee in Ms. Lucas's back. (*Id.*) In a sworn declaration filed after the motions for summary judgment, Officer Rubenstahl stated "I did not intentionally place my knee on Ms. Lucas's back during that arrest. I manipulated her joints—her arms and hands—to get her cuffed with the assistance of Officer Martin." (ECF No. 46-1.)

Officer Martin did not ask Ms. Lucas to put her hands behind her back for handcuffing and does not remember Officer Rubenstahl asking her to do so either. (Martin Dep., 196:7–13.) Officer Rubenstahl applied handcuffs to Ms. Lucas while she was facing the ground, and the officers helped her stand up and sit in a chair on the porch. Ms. Lucas began complaining of hip and back pain immediately after being handcuffed. (Rubenstahl Dep., 220:7–9.)

Officer Rubenstahl testified that he did not recall Ms. Lucas pulling her arms under her body to prevent handcuffing, and he did not report that she struggled or pulled away after she was on the ground. (*Id.* at 219:12–19.) He also testified that the officers and Ms. Lucas "weren't in a physical conflict on the ground" and that she did not resist his effort to handcuff her. (*Id.* at 234:2–

20

22; 242:19–25.) Officer Martin testified that Ms. Lucas did not resist officers' efforts once she was on the ground and that she complied with an order to present her hands for handcuffing. (Martin Dep., 208:7–18.) Accordingly, uncontested evidence in the record shows that Ms. Lucas was not resisting arrest, even passively, after she hit the ground.

BWC video shows that one officer stated, "I got her hands, I got her hands" after the takedown and just before Officer Rubenstahl applied the handcuffs. (Rubenstahl BWC, 19:36:54–57.) Officer Martin's BWC video shows Officer Rubenstahl on top of Ms. Lucas's back while she was on the ground, but the video is too dark and unclear to tell whether he pressed his knee into her back or if he used his body weight to hold her down. The videos do not confirm or blatantly contradict Ms. Lucas's testimony about Officer Rubenstahl pressing his knee into her back or Officer Rubenstahl's statement that he did not intentionally push his knee into her back.

Accordingly, two issues of fact remain for jury consideration: what degree of force Officer Rubenstahl used on Ms. Lucas when she was on the ground (including what degree of body weight force he used and whether he pressed his knee into her back, as alleged) and whether Ms. Lucas was actively resisting arrest immediately before the officers took her to the ground.

### E. Qualified Immunity

Defendants argue that even if a colorable constitutional violation occurred, Officer Rubenstahl and Officer Martin are entitled to qualified immunity because they violated no clearly established right. (ECF No. 41, PageID 2041–42.) Ms. Lucas has the burden to demonstrate that Defendants violated a constitutional right and that the right was clearly established at the time of the challenged conduct. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).

Government officials, including police officers, "are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Thus, an official sued under 42 U.S.C. § 1983 is entitled to qualified immunity unless the plaintiff shows that the official violated a statutory or constitutional right that was "clearly established" at the time of the challenged conduct. *Plumhoff v. Rickard*, 572 U.S. 765, 778 (2014). Generally, whether qualified immunity applies is a question of law for the Court to resolve, but "where . . . the legal questions of qualified immunity turn upon which version of the facts one accepts, the jury, not the judge, must determine liability." *Pouillon v. City of Owosso*, 206 F.3d 711, 715 (6th Cir. 2000) (internal quotations omitted).

Here, genuine issues of material fact affect whether Officer Rubenstahl violated Ms. Lucas's constitutional rights and whether those rights were clearly established at the time. As explained above, whether Ms. Lucas was actively resisting, passively resisting, or not resisting arrest throughout the encounter is an open question of fact that affects the reasonableness of each of the three uses of force.

Given that Ms. Lucas did not (at least initially) refuse to comply with any order, was accused only of a low-severity and non-violent crime, and presented no other indication of an immediate threat, she had a clearly established right to remain free of Officer Rubenstahl's "grab-and-pull" use of force, assuming she was not resisting arrest at the time. *See Coffey v. Carroll*, 933 F.3d 577, 589 (6th Cir. 2019) ("A suspect has a clearly established constitutional right to be free from the use of physical force by police officers when he is not resisting efforts to apprehend him."); *McCaig v. Raber*, 515 F. App'x 551, 555 (6th Cir. 2013) (affirming denial of qualified immunity to an officer where the suspect did not put his hand behind his back because officer physically restrained him from doing so and where the suspect "jerked away" after the officer yelled in his ear). Whether Ms. Lucas was resisting arrest at the time Officer Rubenstahl grabbed

and pulled her is a genuine issue of material fact for the jury to decide.

If Ms. Lucas was not resisting arrest at all, it was also clearly established that Ms. Lucas had the right to be free from an officer forcibly pulling her to the ground. *Meadows v. City of Walker*, 46 F.4th 416, 422 (6th Cir. 2022) ("It has been clearly established for several years in the Sixth Circuit that an officer cannot use injurious physical force to subdue a suspect that is not actively resisting arrest." (citing See *Rudlaff v. Gillispie*, 791 F.3d 638 (6th Cir. 2015)).

Last, it was also clearly established that she had the right to be free from forced body weight pressure or a knee onto her back to handcuff her absent any resistance before or after being taken to the ground. *See Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 902 (6th Cir.2004) ("We have . . . consistently held that various types of force applied after the subduing of a suspect are unreasonable and a violation of a clearly established right."); *Moser v. Etowah Police Dep't*, 27 F.4th 1148, 1153 (6th Cir. 2022) (holding that an officer was not entitled to qualified immunity because "[the officer] put his full weight on [the suspect] despite not touching her with his torso simply by bearing his weight on his knee to pin her to the porch," meaning "a reasonable juror could reject [the officer's] claim that he did not use any injury-threatening force at all against [the suspect]"). It is uncontested that she did not resist arrest once she was on the ground, but it is an open question whether she resisted arrest immediately before she was taken down.

Accordingly, Officer Rubenstahl is not entitled to qualified immunity for his uses of force against Ms. Lucas. *See Meadows v. City of Walker*, 46 F.4th 416, 423–24 (6th Cir. 2022) ("[A]n officer is not entitled to qualified immunity when the facts are disputed, but a reasonable jury could find a set of facts that, if proven at trial, would show that an officer's actions violated a clearly established right." (citing *Wright v. City of Euclid*, 962 F.3d 852, 870 (6th Cir. 2020))).

## II.     Malicious Prosecution

Ms. Lucas claims that Defendants prosecuted her and held her in custody for resisting arrest without probable cause, in violation of the Fourth Amendment. (ECF No. 1, ¶ 77.) In the Sixth Circuit, such a claim "encompasses wrongful investigation, prosecution, conviction, and incarceration." *Wright v. City of Euclid*, 962 F.3d 852, 875 (6th Cir. 2020) (quoting *Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010)). To succeed on a Fourth Amendment malicious prosecution claim under 42 U.S.C. § 1983, "a plaintiff must show that a government official charged him without probable cause, leading to an unreasonable seizure of his person." *Chiaverini v. City of Napoleon, Ohio*, 602 U.S. 556, 558 (2024) (citing *Thompson v. Clark*, 596 U.S. 36, 43, and n. 2 (2022)). A plaintiff must also prove "that, as a consequence of a legal proceeding, he suffered a deprivation of liberty apart from the initial seizure." *Wright*, 962 F.3d at 875–76.

Defendants argue that they are entitled to summary judgment on this claim because Officer Rubenstahl had probable cause to arrest Ms. Lucas for resisting arrest based on her interaction with police on February 20, 2022. (ECF No. 41, PageID 2043.) "In general, the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible." *Gardenhire v. Schubert*, 205 F.3d 303, 315 (6th Cir. 2000) (quoting *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir.1995)). As determined above, even construing the evidence in Officer Rubenstahl's favor, a genuine issue of material fact exists regarding whether Ms. Lucas resisted arrest. In other words, a reasonable juror could determine that he did not have probable cause to file the resisting arrest charge against her.

Even so, Ms. Lucas fails to present evidence that she experienced a deprivation of liberty apart from the initial seizure. Something more than an "initial arrest alone" is required to show an independent deprivation of liberty, and "service with a summons to appear at trial or some other

24

court proceeding does not rise to the level of a constitutional deprivation." *Wright*, 962 F.3d at 876–77 (quoting *Noonan v. Cty. of Oakland*, 683 F. App'x 455, 463 (6th Cir. 2017)).

Officers Rubenstahl and Martin arrested Ms. Lucas on a warrant for criminal damaging, which was the origin of her interaction with the police at her house that night. She was later released from the hospital, and no officer deprived her of her liberty. She was hospitalized because of her complaints of injuries resulting from her arrest on that warrant, not for any independent reason. Her hospitalization was an extension of the arrest, and it was not extended beyond the time reasonably necessary to care for her potential injuries resulting from that arrest. *See Miller v. Maddox*, 866 F.3d 386, 393 (6th Cir. 2017) ("Any extension of a seizure beyond the time reasonably required to carry out the seizure's purpose is unlawful."). Ms. Lucas makes no argument that she was held at the hospital for a reason independent from the initial seizure. (*See* ECF No. 44, PageID 2087–88.) She only argues that the initial seizure and the stay at the hospital resulted from the officers' unnecessary use of excessive force. (*Id.*)

Because the deprivation of liberty in question was not independent from Officer Rubenstahl's initial seizure of Ms. Lucas on the arrest warrant for criminal damaging, Ms. Lucas cannot meet the elements of a malicious deprivation claim. Defendants' Motion for Summary Judgment is **GRANTED** regarding that claim.

## CONCLUSION

For the reasons stated in this Opinion and Order, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion for Summary Judgment. (ECF No. 41.) The Court **DENIES** Ms. Lucas's Partial Motion for Summary Judgment. (ECF No. 37.) Ms. Lucas's excessive use of force claim against Officer Rubenstahl can continue regarding all three uses of force. Her excessive use of force claim against Officer Martin and her malicious prosecution claim

against Officer Rubenstahl are **DISMISSED**. Ms. Lucas has withdrawn her *Monell* liability claim against the City of Reynoldsburg, so that claim is also **DISMISSED without prejudice**.

The Clerk is **DIRECTED** to terminate the City of Reynoldsburg and Officer Martin as defendants. This case remains open.

**IT IS SO ORDERED.**

<u>6/2/2025</u>                                            <u>s/Edmund A. Sargus, Jr.</u>
**DATE**                                               **EDMUND A. SARGUS, JR.**
                                                    **UNITED STATES DISTRICT JUDGE**